## United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Mark Filip | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 3453 | **DATE** | 4/20/2004 |
| **CASE TITLE** | MOHAMMAD SAKET vs. AMERICAN AIRLINES, INC. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
      ☐ FRCP4(m)   ☐ Local Rule 41.1   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] ENTER MEMORANDUM OPINION AND ORDER: Defendant American Airline's Motion for Summary Judgment is denied, subject to the limited *caveat* concerning Plaintiff's concession that he is not advancing a stand alone harassment claim. Mr. Saket has presented sufficient evidence to survive summary judgment, at least where American cannot locate what is arguably relevant evidence. Status hearing date of 7/27/04 is stricken and reset to 5/6/04 at 10:30a.m.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | | Document Number |
| | No notices required. | | number of notices | |
| | Notices mailed by judge's staff. | | APR 21 2004 | |
| | Notified counsel by telephone. | | date docketed | |
| ✓ | Docketing to mail notices. | | | 48 |
| | Mail AO 450 form. | U.S. DISTRICT COURT CLERK | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | | |
| TBK | courtroom deputy's initials | 2004 APR 23 PM 3:12 | date mailed notice | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| MOHAMMAD SAKET, | ) | |
| | ) | |
| Plaintiff, | ) | No. 02 CV 3453 |
| | ) | |
| v. | ) | Hon. Mark Filip |
| | ) | |
| AMERICAN AIRLINES, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**DOCKETED**
APR 2 1 2004

MEMORANDUM OPINION AND ORDER

Plaintiff Mohammed Saket ("Plaintiff" or "Saket") filed this suit against his former employer, defendant American Airlines ("Defendant" or "American"), alleging that American discriminated against him because of his national origin in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*. This case is before the Court on Defendant's Motion for Summary Judgment ("Motion"). (D.E. 34.) For the reasons set forth below, the Motion is, save for one limited *caveat*, denied.

I.  Factual Background

Mr. Saket is a naturalized United States citizen who was born and grew up in Iran.[1] (Pl.'s St. ¶ 1.) In June of 1997, American hired Mr. Saket (Def.'s St. ¶ 24) as a plant maintenance man. (*Id.* ¶ 14.) In this position, his duties ranged from tasks such as "minor basic plumbing repair

---

[1] The following facts are taken from the parties' Local Rule ("LR") 56.1 Statements and Responses, as well as other admissible evidence in the record. Where facts are in dispute, the Court describes the version of the facts that is the most favorable to Mr. Saket. This opinion cites to American's LR 56.1(a)(3) statement as "Def.'s. St. ¶ __," to Mr. Saket's LR 56.1(b)(3)(B) statement as "Pl.'s St. ¶ __," and to each party's response as "Def.'s Resp. ¶ __" or "Pl.'s Resp. ¶ __."



such as restrooms, leaks, etc." to assisting "in clean-up, storage[,] and removal of hazardous waste." (*Id.* ¶ 15.) His crew chiefs, including crew chief Gary Weiland (Pl.'s St. ¶ 20), gave him daily work assignments. (*Id.* ¶ 21.) Mr. Saket's crew chiefs reported to supervisors known as "Customer Service Managers." (*Id.* ¶ 21.) Mr. Saket worked under three different Customer Service Managers, one of whom was Robert Wieczorek. (Def.'s St. ¶ 61.) Mr. Wieczorek, in turn, reported to Lauri Bourgeois. (*Id.*) At the time of Mr. Saket's discharge, Ms. Bourgeois, an African-American, was the highest ranking operational manager of the Facilities Maintenance Department at American's O'Hare Airport facilities. (*Id.*)

Mr. Saket and American paint very different pictures of Mr. Saket's work environment. According to Mr. Saket, in the spring of 1998, he complained to his crew chief Gary Weiland that he felt that a majority of the work that Mr. Weiland assigned to him consisted of bathroom, painting, and outdoor duties, and that these duties were not assigned as frequently to non-Iranian plant maintenance men. (Saket Aff. ¶ 21.) Mr. Saket further contends that Mr. Weiland stated that "[t]he only work I have for terrorist people like you is painting and bathroom repair. If you don't like it, leave." (*Id.*) Mr. Saket complained about Mr. Weiland's response to a Customer Service Manager on a Friday. (*Id.* ¶ 22). On the following Monday, Mr. Weiland told Mr. Saket that "no one could change [his] view of you people who held us hostage for 400 days"; Mr. Weiland also pointedly and while cursing advised Mr. Saket that he should not be a "squealer." (*Id.* ¶ 25.) Mr. Saket submitted an affidavit stating that from 1997 until 2000, Mr. Weiland referred to him on a regular basis as a "camel jockey," "dot head," "rag head," "terrorist," and "hostage taker," as well as other more vulgar, derogatory terms. (*Id.* ¶ 29.) American denies that these incidents occurred and contends that Mr. Saket has recently fabricated them so as to

2

attempt to forestall summary judgment.

The parties also disagree over a workplace incident regarding what the parties have referred to as the "Hangar Two Office." (Pl.'s St. ¶ 61.) Although Mr. Saket was authorized to use this office in the course of his duties (*id.*), one of Mr. Saket's coworkers, Mr. Jensen, entered the Hangar Two Office and screamed at him, "What the [expletive] are you doing in my office, [sic] get your [expletive] terrorist [expletive] out of my office." (Saket Aff. ¶ 49.) During the course of this argument, Mr. Jensen also purportedly said to Mr. Saket, among other things, "Don't you to talk to me, you [expletive] Arab. Get the [expletive] out of here. If you don't leave here within a minute, I am going to give you a permanent dot." (*Id.* ¶ 50.) Mr. Saket went to Customer Service Manager Bob Wieczorek shortly after this incident to complain about Mr. Jensen's remarks and threats. (*Id.* ¶ 52.) Mr. Wieczorek arranged a meeting between Mr. Saket; Lou Sabbia, the union steward; Mr. Jensen; and Mr. Wieczorek. (*Id.* ¶ 53.) After the meeting, Mr. Wieczorek told Mr. Saket that he should "forget everything," that Mr. Jensen was experiencing "a hard time at home," and that Mr. Jensen "didn't mean anything." (*Id.*) According to Mr. Saket, Mr. Wieczorek knew that Mr. Jensen had called Mr. Saket "Mr. Ayatollah," "Mr. Terrorist," "dot head," and "Mr. Highjacker" prior to this incident. (Saket Aff. ¶ 54.) American denies that the Jensen-Saket Hanger Two incident occurred at all (Def.'s Resp. ¶¶ 62-65), and American stated that it could not verify at the time of its LR 56.1 Response whether the alleged subsequent meeting took place. (*Id.* ¶ 67.)

In September of 1999, Mr. Saket became licensed to perform annual fire extinguisher inspections. (Def.'s St. ¶ 27.) Shortly thereafter, Mr. Saket bid into the fire extinguisher serviceman position. (*Id.*) In this role, Mr. Saket was responsible for performing both monthly

3

and annual inspections of several hundred fire extinguishers located throughout American's facilities at O'Hare Airport. (*Id.*) The normal procedure for monthly inspections was for the serviceperson to document the inspection of a particular fire extinguisher on a preventative maintenance sheet ("PM Sheet") and subsequently to update a log book to reflect that the inspection had been completed. (Pl.'s Resp. ¶ 20.) After performing the monthly inspection, the serviceperson was also expected to punch a hole in a metal tag affixed to the extinguisher next to the corresponding month of inspection. (Def.'s St. ¶ 21.) Mr. Weiland supervised Mr. Saket's work as a fire extinguisher serviceperson. (Pl.'s St. ¶ 120.)

In January or February of 2000, American started preparing for an upcoming FAA audit and began planning an internal audit to ensure that testing and inspections of all fire extinguishers had been properly completed. (Def.'s St. ¶ 41.) Approximately three to four months earlier, however, Mr. Saket had received approval to take a vacation and return to Iran to get married. (Pl.'s St. ¶ 143.) While the record is unclear as to what American expected of Mr. Saket (or in what time frame) it is undisputed that he was feeling pressured to get all of his audit-related work done before he left for vacation. (Def.'s St. ¶ 42.)[2] Mr. Saket left for vacation on approximately March 17, 2000, and he returned on April 12, 2000. (Pl.'s St. ¶ 143.)

According to American, while Mr. Saket was on vacation, American personnel preparing for the FAA audit discovered discrepancies between the log book and Mr. Saket's PM Sheets. (Wieczorek Decl. ¶ 18.) American subsequently set up a Board of Inquiry (that consisted of Mr.

---

[2] Mr. Saket stated in his LR 56.1 statement that Mr. Weiland, his supervisor, told him to "do as much as he could with the inspections and servicing before his vacation." (Pl.'s St. ¶ 146.) Although American objected to this statement on materiality grounds, it did not dispute that Mr. Weiland made this statement. (*See* Def.'s Resp. ¶ 146.)

Wieczorek as Chairman and three other American employees) to conduct an investigation into Mr. Saket's potential falsification of fire extinguisher records. (Def.'s St. ¶ 53.) Mr. Wieczorek directed this investigation. (Pl.'s St. ¶ 109.) As a part of the investigation, American conducted several "fact-finding" conferences during which American interviewed several of Mr. Saket's coworkers. (Def.'s St. ¶ 52.)

American determined that Mr. Saket had placed check marks in the fire extinguisher log book for various fire extinguishers without performing the actual inspections in the field. (Wieczorek Decl. ¶ 23.) American arrived at this conclusion after a review of the log book and Mr. Saket's PM Sheets for those same extinguishers did not show a corresponding check mark entry. (*Id.*) American determined that Mr. Saket falsified the log book in an attempt to make it look like he was up to date on his inspections prior to leaving for his vacation. (*Id.*) American also determined that Mr. Saket falsified the punches on a metal tag located on one of the fire extinguishers. Mr. Wieczorek interviewed Mr. Weiland and relied upon Mr. Weiland's input in reaching this conclusion. (Pl.'s St. ¶ 117.) Mr. Saket denies falsifying the extinguisher records or the metal tag.

The investigation concluded on April 19, 2000. (Def.'s St. ¶ 64.) Mr. Wieczorek presented his findings, including statements from various witnesses, to Ms. Bourgeois. (*Id.*) On April 20, 2000, at Ms. Bourgeois's direction, Mr. Wieczorek prepared a Final Advisory, terminating Mr. Saket from American for violating American Airline Rule 16 (Def.'s St. ¶ 74), which prohibits "[m]isrepresentation of facts or falsification of records." (*Id.* ¶ 8.) Ms. Bourgeois considered the results of Mr. Wieczorek's investigation into Mr. Saket's alleged falsification of records, together with other input from Mr. Wieczorek, in deciding to terminate

Mr. Saket. (Pl.'s St. ¶ 133.) Mr. Saket admitted that he has no reason to believe that Ms. Bourgeois's decision to terminate him was motivated by any discrimination and that she had not made any comments to him that were discriminatory, insulting, or harassing in any way. (Def.'s St. 73.)

Mr. Saket filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") on or about May 19, 2000, approximately one month after he was terminated, alleging that American discriminated against him because of his national origin. (*Id.* ¶ 5.) Mr. Saket filed this suit on May 14, 2002.

On April 24, 2003, during discovery in this litigation, Magistrate Judge Nan R. Nolan ordered American to provide plaintiff with the original documents and metal tag allegedly falsified by Mr. Saket. (Pl.'s St. ¶ 107.) On June 11, 2003, American admitted that it did not have any original records, documents, or tags that Mr. Saket allegedly falsified. (*Id.* ¶ 108) American subsequently indicated that these records have been "misplaced." (Def.'s Resp. ¶ 108.) At their depositions, neither Mr. Wieczorek, who directed the investigation that led to American's claim that Mr. Saket falsified records, nor Ms. Bourgeois could identify in the discovery documents that American produced the specific documents or records that Mr. Saket allegedly falsified. (Pl.'s St. ¶¶ 110, 137.) Moreover, neither Mr. Wieczorek nor Ms. Bourgeois could identify anyone at American who could identify these records. (*Id.* ¶¶ 113, 138.)

II. Discussion

   A. Summary Judgment Standard

Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A court's function in ruling on a motion for summary judgment is not to weigh the evidence, but rather to determine if there is a genuine issue of material fact for trial. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). In doing so, the court must view the evidence and draw all reasonable inferences in favor of the party opposing the motion. *Id.* at 255. Where factual matters are in dispute, the Court is required to credit the nonmovant's version of the facts. *See Hostetler v. Quality Dining, Inc.*, 218 F.3d 798, 802 (7th Cir. 2000). Summary judgment is warranted only if a reasonable jury could not return a verdict for the nonmovant. *See Anderson*, 477 U.S. at 248.

   B. Plaintiff Concedes That He Is Not Advancing a Stand Alone Harassment Claim, And One Would Be Barred If He Were

As a preliminary matter, the Court notes that Mr. Saket's Amended Complaint could be fairly read as asserting a national origin harassment claim under Title VII. (*See* Am. Compl. ¶¶ 8, 13, 15.) American argues at length in its Memorandum of Law in Support of its Motion ("Memorandum" or "Mem.") that any national origin harassment claim is beyond the scope of Mr. Saket's administrative filings. (*See* Mem. at 12-15.) Mr. Saket limits his response to this argument to a footnote in his Memorandum of Law in Opposition to Defendant's Motion for

7

Summary Judgment ("Opposition"). (*See* Opposition at 9 n.6.) In that footnote, Mr. Saket states that "American's argument that Mr. Saket cannot sue for harassment . . . is besides the point. Mr. Saket's claim is that *his discharge was the product of national origin discrimination*—the relentless campaign of harassment he experienced is trenchant evidence of that discrimination." (*Id.*) (emphasis added). The Court reads Mr. Saket's footnote to concede that he is not advancing the putative harassment claim that American identifies. Indeed, the footnote identifies one claim—a claim for wrongful discharge—and it appears to clarify how the alleged harassment, in Mr. Saket's view, is evidence in support of that claim. Accordingly, American's Motion is moot to the extent that it seeks summary judgment of a national origin harassment claim that Mr. Saket is not advancing in this litigation.

This would not be the case, however, if the Court misreads Mr. Saket's footnote and Mr. Saket *is* seeking to advance the harassment claim American identifies. In his Opposition, Mr. Saket never attempted to argue that the putative harassment claim is "within the scope of the charges" contained in his administrative complaint. *Cheek v. Peabody Coal Co.*, 97 F.3d 200, 202 (7th Cir. 1996). In fact, Mr. Saket advanced no meaningful argument on this point at all. By failing to address American's beyond-the-scope argument, Mr. Saket has waived any argument in support of a stand alone harassment claim. *See, e.g., Harris v. Univ. of Ill. at Chicago*, No. 97-4783, 1999 WL 281346, at *9 (N.D. Ill. Mar. 31, 1999) (holding that plaintiff's failure to address beyond-the-scope-of-the-EEOC-charge argument results in waiver and entitles the defendant to summary judgment); *accord Lewis v. Xerox Corp.*, No. 95-7013, 1998 WL 160893, at *6 (N.D. Ill. Mar. 31, 1998) (citing, *inter alia, United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) (per curiam)). Therefore, to the extent that Mr. Saket is advancing the stand alone harassment

claim, the Court grants summary judgment against Mr. Saket on that claim.[3]

### C. National Origin Discrimination Under Title VII

Title VII, in relevant part, makes it illegal for an employer "to discharge any individual . . . because of such individual's . . . national origin." 42 U.S.C. § 2000e-2(a)(1). A Title VII plaintiff seeking to "defeat an employer's motion for summary judgment has two methods of proof at his or her disposal." *Pafford v. Herman*, 148 F.3d 658, 665 (7th Cir. 1998). Under the first method, the "direct method," the plaintiff may show through direct or circumstantial evidence that the discharge was motivated by the plaintiff's national origin. *Id.* The circumstantial evidence, however, "must point directly to a discriminatory reason for the employer's action." *Cerutti v. BASF Corp.*, 349 F.3d 1055, 1061 (7th Cir. 2003) (internal quotation and citation omitted). Under the second method, the "indirect method" of proof, a plaintiff without direct evidence of national origin discrimination can defeat an employer's summary judgment motion by employing the burden-shifting approach outlined in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Maarouf v. Walker Mfg. Co., Div. of Tenneco Auto., Inc.*, 210 F.3d 750, 752 (7th Cir. 2000).

Under the *McDonnell Douglas* burden-shifting framework, a plaintiff must first establish a *prima facie* case of national origin discrimination. *Id.* To establish a *prima facie* case, a plaintiff must demonstrate that he or she: (1) is a member of a protected class; (2) was meeting the employer's legitimate performance expectations; (3) has suffered an adverse employment

---

[3] As discussed below, the Court considered Mr. Saket's allegations of harassment as circumstantial background evidence relevant—for purposes of American's Motion—to the issue of pretext. Because American did not object to the admissibility of such evidence for this purpose in its Motion and related briefs, the Court takes no position on whether this evidence will ultimately survive any potential trial-related objection that American may assert.

action; and (4) that similarly situated employees not in the protected class were treated more favorably. *Id.* Once the plaintiff has made these showings, the plaintiff has established a rebuttable presumption of national origin discrimination, and the burden shifts to the employer to offer a "legitimate, non-discriminatory reason" for the discharge. *Id.* If the employer meets its burden, then the burden shifts back to the plaintiff, who must prove that the employer's stated reason for the discharge is merely a pretext for national origin discrimination.[4] *Id.* The Seventh Circuit has repeatedly instructed, however, that the burden-shifting framework of *McDonnell Douglas* is flexible, and that it is appropriate to modify the framework to "meet the facts of a particular case." *Jones v. Union Pac. R.R. Co.*, 302 F.3d 735, 742 (7th Cir. 2002). In this regard, the facts of a case sometimes "call for a simultaneous review of [whether the employee was meeting the employer's legitimate expectations] and pretext" where those two issues are intertwined as framed. *Id.*

1. Direct Method Of Proof

To proceed under the direct method, Mr. Saket "must provide direct or circumstantial evidence that the *decisionmaker*" discharged him because of his national origin. *Rogers v. City of Chicago*, 320 F.3d 748, 754 (7th Cir. 2003) (emphasis in original). The parties agree that Ms. Bourgeois is the formal decision-maker in this case, although Mr. Saket argues that what he perceives as discriminatory animus of other American employees should be imputed to her, regardless of whether she personally harbored any subjective discriminatory animus. (*See, e.g.*, Opposition at 6 ("Ms. Bourgeois is not a quarantined decision-maker.").) Direct evidence, for

---

[4] Despite these shifting burdens of production, the ultimate burden of persuasion always remains with the plaintiff to prove that he or she was discharged because of his or her national origin. *See, e.g., Cianci v. Pettibone Corp.*, 152 F.3d 723, 726 (7th Cir. 1998).

purposes of this case, is evidence that, if believed by the trier of fact, would prove that Ms. Bourgeois discharged Mr. Saket because of his national origin without reliance on inference or presumption. *See Rogers*, 320 F.3d at 748. Circumstantial evidence that would allow Mr. Saket to proceed under the direct method of proof is evidence that points directly to Mr. Saket's having been terminated because of national origin. *See Cerutti v. BASF Corp.*, 349 F.3d 1055, 1061 (7th Cir. 2003). In this regard, "[c]ircumstantial evidence under the direct method . . . must itself show that the decisionmaker acted because of the prohibited animus." *Venturelli v. ARC Comm. Servs., Inc.*, 350 F.3d 592, 601 (7th Cir. 2003).

Mr. Saket has not produced sufficient direct or circumstantial evidence to proceed under the direct method of proof. Mr. Saket claims that "the epithets hurled at [him by employees other than Ms. Bourgeois] constitute direct evidence of discrimination based on his national origin, evidence which alone defeats American's motion." (Opposition at 9.) The Court respectfully disagrees. Mr. Saket admitted that he had no reason to believe that Ms. Bourgeois's decision to terminate him was motivated by any discrimination and that she was not racist. (Saket Dep. 382-384.) He further admitted that Ms. Bourgeois did not make any comments to him that were discriminatory, insulting, or harassing in any way. (Def.'s St. ¶ 73.) Moreover, stray remarks, unconnected to Mr. Saket's discharge and made by such individuals as Mr. Weiland and Mr. Jensen cannot, as a matter of law, serve as direct evidence of wrongful discharge based on national origin. *See, e.g., Fuka v. Thomson Consumer Elec.*, 82 F.3d 1397, 1403 (7th Cir. 1996); *see also Maarouf*, 210 F.3d at 754 (noting that comments about Arabic heritage that were not tied to employee's termination could not provide direct evidence of discrimination). Mr. Saket also argues that Ms. Bourgeois's reliance on Mr. Wieczorek's investigation in deciding to

terminate Mr. Saket is direct evidence of national origin discrimination because Mr. Wieczorek condoned Mr. Jensen's national origin harassment of Mr. Saket by telling Mr. Saket to "forget everything" in response to a complaint Mr. Saket filed against Mr. Jensen. The Court respectfully disagrees. This statement, like the epithets, was unconnected to Mr. Saket's discharge and cannot serve as direct evidence of national origin discrimination. *Fuka*, 82 F.3d at 1403. Similarly, for Mr. Wieczorek and Weiland's "statements to be sufficient circumstantial evidence under the direct method, the remark[s] in question must be directly related to" Mr. Saket's discharge. *Venturelli*, 350 F.3d at 602 (internal quotation omitted). As already discussed, none of the statements identified by Mr. Saket allegedly made by Mr. Wieczorek and Mr. Weiland, however, were related to Mr. Saket's discharge. Therefore, Mr. Saket must rely on the indirect method of proof to defeat American's Motion.

2. <u>Indirect Method Of Proof</u>

American only challenges the second element of Mr. Saket's *prima facie* case—namely, that Mr. Saket was meeting American's legitimate employment expectations. Under the circumstances of this case, the Court will address this element and the issue of pretext simultaneously because the facts surrounding Mr. Saket's discharge are intertwined with the issue of pretext. *See Jones*, 302 F.3d at 742; *Fuka*, 82 F.3d at 1404.

The Court holds that Mr. Saket has discharged his burden of showing that a reasonable jury might find for him on the meeting-employment-expectations and pretext issues—even if he has just barely done so. The Court's finding is based on the combination of the following three factors—none of which alone would have been enough to forestall summary judgment: (1) the fact that American cannot locate any of the original allegedly falsified records; (2) Mr. Saket's

"cat's paw" theory as to the involvement of Mr. Wieczorek, who, despite never having been alleged to have made any racist comments, allegedly refused to discipline another American employee whom Wieczorek allegedly knew was repeatedly harassing Mr. Saket based on his ethnicity; and (3) the role that Mr. Weiland, another alleged racial harasser, played as one source of information in the investigation that led to Mr. Saket's termination.

First, the Court notes that American cannot locate the originals of any of the safety records that Mr. Saket allegedly falsified. While American argues that Mr. Saket and union officials allegedly saw the falsified records in the past, and that the only issue is whether Ms. Bourgeois sincerely believed that there were falsified safety records, the Seventh Circuit has repeatedly cautioned that "[w]hen evidence bearing on a particular matter lies within the exclusive possession of the party seeking summary judgment, a court must be circumspect in evaluating the movant's factual averments, particularly when that party bears the burden of proof." *Avery v. Mapco Gas Products, Inc.*, 18 F.3d 448, 452 n.4 (7th Cir. 1994); *accord, e.g., Dey v. Colt Contr. & Dev. Co.*, 28 F.3d 1446, 1459 n.12 (7th Cir. 1994). A jury might possibly be willing to credit the contention that American's "record falsification" basis for firing Mr. Saket was a pretext (remember, Saket contends that he did not falsify any records, and that he was told it was acceptable if he did not complete every inspection before he left for Iran) if American cannot locate any of the safety records that were falsified.

A second factor that might (at least in combination with the other two factors) lead a reasonable jury to find in Mr. Saket's favor is Mr. Wieczorek's leadership of the investigation that led to Mr. Saket's firing. (Again, American denies any misconduct by Mr. Wieczorek, but for present purposes, Mr. Saket's version must now be credited.) In this regard, the Court notes

13

initially that American's argument that *Shager v. Upjohn Co.*, 913 F.2d 398 (7th Cir. 1990), and related authority is inapplicable is unpersuasive. As the Seventh Circuit has explained, *Shager* teaches that "there can be situations in which the forbidden motive of a subordinate employee can be imputed to the employer because, *under the circumstances of the case*, the employer simply acted as the 'cat's paw' of the subordinate." *Willis v. Marion County Auditor's Office*, 118 F.3d 542, 547 (7th Cir. 1997) (emphasis added). The Seventh Circuit has reiterated this general principle in several post-*Shager* cases. *See, e.g., Maarouf*, 210 F.3d at 754 (citing *Shager*). The issue, then, is whether Mr. Saket has produced sufficient evidence so that a reasonable jury could find that Ms. Bourgeois's decision to terminate him was manipulated by an individual who harbored discriminatory animus towards Mr. Saket and that Ms. Bourgeois was the unwitting "cat's paw" for the subordinate.

Mr. Wieczorek directed the investigation that led to Mr. Saket's termination, and Ms. Bourgeois at least arguably relied on Wieczorek's findings in deciding to discharge Mr. Saket. To be sure, Mr. Wieczorek is conceded never to have made any racists comments to Mr. Saket. Nonetheless, Mr. Saket has submitted evidence that Mr. Wieczorek failed to discipline one of Mr. Saket's coworkers after that coworker was allegedly making ethnic slurs against Mr. Saket, even though Mr. Wieczorek allegedly knew that coworker had also previously called Mr. Saket derogatory racist names. (Saket Aff. ¶ 54.) A reasonable jury might conclude that Mr. Wieczorek's alleged response (telling Mr. Saket to "forget about it" because the alleged harasser was confronting difficult problems at home and did not mean anything) was the product of non-prohibited factors—for example, a desire simply to avoid conflict, or sympathy for a coworker's alleged domestic problems. However, a reasonable jury also might conclude that Mr.

14

Wieczorek's failure to discipline that coworker reflects bias and prejudice on the part of Mr. Wieczorek, who allegedly knew that the alleged harasser had already made ethnic slurs in the past. Given Mr. Wieczorek's role leading the investigation of Mr. Saket's alleged record falsification and Ms. Bourgeois's reliance on Mr. Wieczorek's findings, a jury might find that Wieczorek's alleged bias fundamentally tainted Ms. Bourgeois's decision to terminate Mr. Saket.

Third, the role of Mr. Weiland as a meaningful source of information in American's investigation of Mr. Saket also (at least in combination with the other two factors indentified above) could lead a reasonable jury to find for Mr. Saket. In this regard, Mr. Wieczorek and his colleagues relied upon Mr. Weiland's input in concluding that Mr. Saket had falsified the fire extinguisher records. Notably, Mr. Weiland supervised Mr. Saket's duties as a fire serviceman—and Mr. Saket was purportedly terminated for activities related to those duties. Mr. Saket has submitted evidence that Mr. Weiland called him on a regular basis, among other things, a "camel jockey," "dot head," "rag head," "terrorist," and "hostage taker," as well as other vulgar, derogatory names. (Saket Aff. ¶ 29.) Mr. Saket also offered evidence that Mr. Weiland had stated to him that "[t]he only work I have for terrorist people like you is painting and bathroom repair. If you don't like it, leave." (*Id.* ¶ 21.)

American responds to this evidence with a powerful combination of evidence of its own. For example, American points to the unrebutted fact that Mr. Saket was walking on very thin ice at the time of his termination—after having received a "final warning letter" from American as a consequence of Plaintiff's own prior racist behavior—such that any falsification of records would likely prompt his termination. This prior racist behavior involved an incident in which Plaintiff and a coworker made a noose and were discussing it in front of an African-American employee

15

who was understandably offended, and a prior incident involving Plaintiff's offensive ethnic slur against a Polish-American coworker. American also contends that the alleged onslaught of racists comments towards Mr. Saket are simply recent fabrications offered as an attempt to forestall summary judgment. American further notes that the investigation of Mr. Saket was carried out with substantial involvement from Mr. Saket's union representative, and that the union later told Saket that he had no discrimination case worth pursuing against American. American also notes that there is no allegation that Mr. Weiczorek ever made any racist comments, and that even if he somehow could be seen as impliedly racist (as a result of his telling Plaintiff to "forget about" alleged racists comments from a coworker), that Ms. Bourgeois had substantial personal involvement in the decision to fire Plaintiff. And finally, American notes that even Mr. Saket concedes that Ms. Bourgeois, the person who fired him (at least formally, again the matter is in dispute) is conceded not to be a racist and not to have ever made any racist comments to Mr. Saket. All of these points may well make a compelling jury argument. But, as previously discussed, the three factors identified above, at least in combination, might lead a reasonable jury to find in Saket's favor, at least as the record has presently been framed. It is improper to grant summary judgment merely because the Court believes that the movant is likely to prevail at trial. *See, e.g., American Int'l Group, Inc. v. London Am. Int'l Corp. Ltd.*, 664 F.2d 348, 351 (2d Cir. 1981).

## CONCLUSION

For the reasons set forth above, Defendant American Airline's Motion for Summary Judgment is denied, subject to the limited *caveat* concerning Plaintiff's concession that he is not advancing a stand alone harassment claim. Mr. Saket has presented sufficient evidence to survive summary judgment, at least where American cannot locate what is arguably relevant evidence.

SO ORDERED.

_____
Mark Filip
United States District Judge
Northern District of Illinois

Dated: __APR 2 0 2004__